**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                              **Case No. 4:20-cr-00027 KGB**

GARY LEVELL HARRIS                                          DEFENDANT

## <u>ORDER</u>

Pending before the Court is defendant Gary Levell Harris's motion to suppress (Dkt. No. 22; 23).  The government responded to Mr. Harris's motion (Dkt. No. 31).  The Court conducted a hearing on the motion to suppress on July 13, 2020, at which Mr. Harris and the government presented evidence and argument for the Court's consideration (Dkt. Nos. 33; 34; 35; 36).  Mr. Harris and the government also filed post-hearing briefs (Dkt. Nos. 39; 40).  Along with his motion to suppress, Mr. Harris has filed a motion to amend order setting conditions of release (Dkt. No. 32), to which the government responded (Dkt. No. 38).

For the following reasons, the Court denies Mr. Harris's motion to suppress and denies his motion to amend order setting conditions of release (Dkt. Nos. 22; 23; 32).

### I.      Motion To Suppress

In his motion to suppress, Mr. Harris acknowledges that the government obtained an indictment against him that alleges he is a convicted felon who, on December 14, 2019, and December 19, 2019, possessed ammunition in violation of 18 U.S.C. § 922(g)(1) (Dkt. No. 22, ¶ 1).  Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C), Mr. Harris moves this Court to suppress the physical evidence seized and his inculpatory statements made to North Little Rock Police Department ("NLRPD") officers on December 14, 2019, and December 19, 2019.  He maintains that NLRPD officers illegally arrested him on December 14, 2019, in violation of the ruling in *Payton v. New York*, 445 U.S. 573 (1980) (Dkt. Nos. 22, ¶¶ 3-4; 23, at 1).  Further, he

maintains that the unwarranted search of his home and seizure of ammunition on December 19, 2019, violated the Fourth Amendment of the United States Constitution because he claims that the probable cause affidavit did not state facts that demonstrated there was a reasonable belief that officers would find firearms and ammunition inside Mr. Harris's home and that facts stated in the probable cause affidavit were derived from the illegal December 14, 2019, search and seizure (Dkt. No. 22, ¶¶ 6-8). Mr. Harris also argues that the search was unreasonable because of the method in which the search was carried out on December 19, 2019 (Dkt. No. 22, ¶¶ 9-10).

### A.    Factual Background:  Events Of December 14, 2019

Mr. Harris argues that NLRPD officers violated his Fourth Amendment rights on December 14, 2019, when they entered his home and made a warrantless arrest. Mr. Harris also argues that, after NLRPD officers illegally arrested him, the written consents to search his vehicle and house were invalid and flowed from his illegal arrest, such that the illegal arrest requires the invalidity of his later consents. Mr. Harris maintains that, for the same reasons, any incriminating statements he made on December 14, 2019, are also invalid. Mr. Harris asserts that, as a result, the evidence seized December 14, 2019, should be suppressed under the Fourth Amendment's Exclusionary Rule.

The government argues that Mr. Harris was not arrested but "was detained pending the officers' investigation into the shooting of the dog and stepped outside the home prior to officers' handcuffing him." (Dkt. No. 31, at 7). Essentially, the government argues that this was an investigative stop under *Terry v. Ohio*, 392 U.S. 1, 25-30 (1968), that only needed to be supported by reasonable, articulable suspicion that criminal activity is afoot, not the probable cause necessary for an arrest (Dkt. No. 31, at 8). The government asserts that, during a *Terry* stop, "officers may check for weapons and may take any additional steps 'reasonably necessary to protect their

2

personal safety and maintain the status quo during the course of the stop'" (Dkt. No. 31, at 9 (quoting *United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992)).

The government also argues that, "even if he was initially detained in his home, there existed exigent circumstances for officers to detain him on his front porch." (Dkt. No. 31, at 7-8, 13-15). "The searches in *Payton* occurred in the absence of any exigent circumstances, and the court reserved judgment as to what circumstances, if any, might otherwise justify a warrantless entry." *United States v. Williams*, 633 F.2d 742, 744 (8th Cir. 1980). For these reasons, the government asserts that law enforcement officers' "legitimate concern for the safety of themselves or others" may amount to exigent circumstances when "focusing on what a reasonable, experienced police officer would believe." *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003)). The government relies, in part, on *United States v. Meidel*, 764 F.3d 844, 845 (8th Cir. 2014), and *United States v. Poe*, 462 F.3d 997, 1001 (8th Cir. 2006) (Dkt. No. 31, at 15 (factual recitation by government)).

Further, the government contends that Mr. Harris's "consent to search the residence was made voluntarily" and that "the consent was sufficiently attenuated" even if the initial encounter violated *Payton* (*Id.*, at 8). Mr. Harris disagrees.

At the suppression hearing, NLRPD officer Scott Harton testified. Officer Harton is a patrol officer with 12 years of experience. He was working the 6:00 a.m. to 2:00 p.m. shift and was dispatched to 121 South Spruce street on December 14, 2019, as the secondary officer (Harris Ex. 1). He arrived first on the scene, found a dog that had been shot in the head at close range in the middle of the street, and made contact with the original caller, Ateasha Fitzhugh, who reported that an individual had shot a dog in the middle of the street (Gov. Exs. 6, 7). Based on the record before the Court, the alleged incident occurred at approximately 1:00 in the afternoon on a

Saturday. It was a clear day in a residential neighborhood.  A mother and several minor children witnessed the event.  Officer Harton did not arrive with blue lights and sirens on because, as he testified, he did not know where the shooter was and did not want to draw attention to himself.

At a certain point, the dog's owner, Estefany Perez-Rodriguez, came out and reported that, although she heard the shot, she had not seen who shot her dog.  Officer Harton assisted Ms. Perez in placing the dog in her car so that she could take the dog to the veterinarian.  While Officer Harton helped Ms. Perez-Rodriguez load her dog into her car, Officer Steele, Officer Moyster, Officer Miller, Sergeant Bailey, and Lieutenant Lacy arrived on the scene.  Officer Harton then returned to speak with Ms. Fitzhugh.  During those conversations, Ms. Fitzhugh reported that she and her minor children saw an African American male exit 104 South Spruce with a handgun and shoot the dog in the head one time, walk over to a Grand Marquis, open the driver's side door, possibly put something in the car, and walk back inside the house.

Officer Steele also testified at the suppression hearing.  He has 19 years of experience as a NLRPD officer, and he was the primary officer dispatched to 121 South Spruce on December 14, 2019.  He arrived second on the scene.  He stayed by the wounded dog when he arrived, observed Officer Harton speak to Ms. Fitzhugh, and witnessed Ms. Perez load the dog into her vehicle to seek treatment.

Officer Moyster, Officer Miller, Sergeant Baily, and Lieutenant Lacy also arrived on the scene.  According to Officer Harton, while he was still speaking with Ms. Fitzhugh, the other officers along with Officer Steele attempted to make contact with Mr. Harris at the residence at 104 South Spruce (Gov. Ex. 1).  Officer Moyster went around back on the east side of the residence, and Sergeant Bailey was on the west side.  Officers Miller and Steele were on the west side closest to the door, and Officer Lacy was on the northwest corner.  Officer Steele had a patrol

rifle, which was an AR-15, and Sergeant Bailey had his pistol drawn as well.  With an open palm, Officer Steele banged on a window announcing "NLRPD."  Officer Steele did not approach the front door, as he was concerned about an active shooting event.

According to Officer Steele, Sergeant Bailey was on the west side because no one realized the house was a multiunit dwelling—either a duplex or triplex; Mr. Harris did not reside on the side where Sergeant Bailey was positioned.  According to Officer Steele, Sergeant Bailey may have said, "NLRPD, we need to talk to you," while outside on the west side.  He had a pistol drawn, pointed it at Mr. Harris as he exited his home, but dropped it at some point after Mr. Harris exited the residence.

According to Officers Steele and Harton, it took Mr. Harris approximately seven to ten minutes to open the door to the residence (Dkt. No. 23, at 3).  Mr. Harris appears to dispute this timeline, claiming that he responded quickly (Dkt. No. 40, at 4-5).  Mr. Harris takes the position that he "awoke from a mid-day nap to the sound of someone outside his house banging on his window and yelling, 'North Little Rock Police!'" (Dkt. No. 23, at 2).  Officer Harton heard on the police radio that the other officers had made contact with Mr. Harris and, when he heard that, he looked over and observed Mr. Harris coming out of his front door.  Officers Steele and Miller were underneath the window to the residence.  Sergeant Bailey appeared from the left as Mr. Harris walked out the front door, motioned for Mr. Harris to step off the front porch, and pointed a pistol at Mr. Harris (Dkt. No. 40, at 5).  Officer Steele testified that, when Mr. Harris exited the residence, the officers directed Mr. Harris to put his hands up and to make a complete circle, which he did.  Mr. Harris was compliant.

Officer Harton then walked over and detained Mr. Harris at approximately 1:05 p.m.  When he handcuffed him, Mr. Harris had just walked down the steps from his front porch and was

standing in his yard.   According to Officer Harton, he detained Mr. Harris for officer and community safety to ensure Mr. Harris did not have a weapon on his person, given that the reported incident involved a gun and active shooting and he had reasonable suspicion that a crime had been committed.

Officer Steele testified that he asked Mr. Harris if there were any other people in the residence.  Mr. Harris replied that he was alone.  Officer Harton observed that, when Mr. Harris exited the residence, he was wearing a white shirt which differed from the black shirt Ms. Fitzhugh described the shooter as wearing.  Officer Harton walked Mr. Harris away from the house for safety while Officer Steele and another officer made a protective sweep of the residence to ensure that no other individuals were in the residence.  After Mr. Harris was off the porch, Officer Steele returned his patrol rifle to his vehicle.

After obtaining Mr. Harris's name, Office Harton read Mr. Harris his *Miranda* rights. While speaking to Mr. Harris about the alleged events, it seemed to Officer Harton that Mr. Harris was giving indicators of deception.  Officer Harton testified that it did not appear to him that Mr. Harris was intoxicated or did not understand the questions asked or requests made that day.  Officer Harton placed Mr. Harris into the backseat of his patrol vehicle and spoke with him there for several minutes.  At some point, Mr. Harris asked for the handcuffs to be moved to the front, and Officer Harton did that.  Mr. Harris also complained about being uncomfortable in the back seat of the patrol vehicle.  Officer Harton testified that he detained Mr. Harris to investigate the incident.  He testified that a car matching the description of the Grand Marquis provided by Ms. Fitzhugh was parked outside of the residence at 104 South Spruce, that Mr. Harris matched the physical description of the alleged shooter with the exception that he was wearing a different

colored shirt from the description provided by Ms. Fitzhugh, and that Mr. Harris exited the residence at 104 South Spruce.

During their conversation, Officer Harton asked Mr. Harris for permission to search the Grand Marquis, Mr. Harris's vehicle. Officer Harton represented to Mr. Harris that he "knew where the gun was" and that if Mr. Harris allowed him to search the vehicle that would "squash the whole thing" (Harris Ex. 1). Mr. Harris executed a written consent form for the search of the car at 1:19 p.m. (Gov. Ex. 3). At that point, no officer had a weapon drawn or pointed at Mr. Harris. Officer Harton searched the car; Mr. Harris gave the officers a key and observed the search. At no point did Mr. Harris revoke consent. Officer Harton did not seize anything from the Grand Marquis as a result of the search. At some point, the officers learned of Mr. Harris's prior felony convictions.

After failing to find a gun in Mr. Harris's vehicle, Officer Harton also asked Mr. Harris for permission to search his residence. Mr. Harris initially replied that he would not consent to a search of his home, stating that "I'm not going to sign the consent cause I don't have a gun in there and if you don't believe me now, you're not going to believe me later." (Gov. Ex. 2, at 35:16). Mr. Harris then asked if, when he let the officers search his home, they would release him. When Officer Harton stated that this sounded "like a good plan," Mr. Harris agreed to the search. (Gov. Ex. 2, at 35:37). Mr. Harris executed a written consent form for the search of the residence at 1:39 p.m. (Gov. Ex. 4).

Officers Harton and Steele searched the residence. First, they searched the couch in the living room. Lieutenant Lacy and Officer Miller came into the residence and stood with Mr. Harris, who was seated on his couch in his living room inside the residence while the residence was searched. At no point did Mr. Harris revoke consent. The search of the residence lasted

approximately 20 to 23 minutes.  Officer Steele searched a portion of the living room, the kitchen, a bathroom, and two bedrooms.  Officer Harton searched the living room, the hall closet, a bathroom, the attic, and the master bedroom.  Officer Harton testified that he searched the nightstand in the room first and found no weapons or ammunition in the nightstand.  He located several boxes of ammunition, approximately 83 rounds, inside the master bedroom closet on a top shelf.  Mr. Harris explained that, although he knew the ammunition was there, he had forgotten about it.  Officer Harton seized the ammunition because it appeared that the ammunition may have been an element of a crime—felon in possession and cruelty to animals—that occurred.  Also, Officer Harton was aware that a federally convicted felon cannot possess ammunition.

Officer Harton testified that his entire interaction with Mr. Harris lasted a little over an hour.  At no point did Officer Harton pull his weapon on Mr. Harris.  After the interaction, Mr. Harris was not arrested; he was released and allowed to return to his residence.  At the beginning of his interaction with Mr. Harris, Officer Harton initiated recording equipment on his vest.  As a result, much of Officer Harton's interactions with Mr. Harris are recorded; the Court has viewed the video and audio (Gov. Ex. 2).

### B.    Legal Analysis:  Events Of December 14, 2019

Mr. Harris argues that he was illegally arrested in his home on December 14th, 2019 (Dkt. No. 23).  The government maintains that the officers did not arrest Mr. Harris, nor did they detain him inside of his home (Dkt. No. 31).  The government also argues that, even if they did arrest Mr. Harris inside of his home, exigent circumstances justified the arrest.  Further, the government argues that, even if the Court does not find exigent circumstances existed to justify the allegedly unconstitutional search and seizure, the evidence seized in searching Mr. Harris's home and his

incriminating statements are sufficiently attenuated from any unconstitutional actions as to be admissible.

### 1.    Fourth Amendment Requirements

The Fourth Amendment of the United States Constitution guarantees the right to be free from "unreasonable searches and seizures."  U.S. Const. amend. IV.  "It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'"  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).  The area "immediately surrounding and associated with the home," the curtilage, is "part of the home itself for Fourth Amendment purposes."  *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

"Whether a seizure occurs is a question of law."  *United States v. Dixon*, 51 F.3d 1376, 1379 (8th Cir. 1995).  "A seizure [of a person] occurs only if, considering all of the circumstances, a reasonable person would believe that he is not free to leave."  *United States v. Dixon*, 51 F.3d 1376, 1379 (8th Cir. 1995) (citing *INS v. Delgado*, 466 U.S. 210, 215 (1984)).  "In addition, for a seizure to occur, there must be either a physical application of force by the officer or a submission to the officer's assertion of authority."  *United States v. Dixon*, 51 F.3d 1376, 1379 (8th Cir. 1995) (citing *California v. Hodari D.*, 499 U.S. 621, 626–29 (1991); *United States v. Thompkins*, 998 F.2d 629, 633 (8th Cir.1993)).  "Seizures fall into two categories:  investigative stops and arrests."  *Dixon*, 51 F.3d at 1380.  In distinguishing a stop from an arrest, the court considers the length of the detention and the conduct of law enforcement officers.  *Id.*

The Supreme Court has recognized, however, that this presumption against warrantless searches and seizures inside the home may be overcome in some circumstances because "the ultimate touchstone of the Fourth Amendment is reasonableness."  *Brigham City*, 547 U.S. at 403.

The Eighth Circuit has recognized a "knock-and-talk" exception to the Fourth Amendment's warrant requirement which permits "a police officer not armed with a warrant [to] approach a home and knock." *United States v. White*, 928 F.3d 734, 739 (8th Cir. 2019) (citing *Jardines*, 569 U.S. at 8). This exception "is founded on the implicit license all of us, including law enforcement officers, enjoy to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* (internal quotations omitted). In addition, "[o]ne well-recognized exception applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" *Kentucky v. King*, 563 U.S. 452, 460 (2011) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)).

### 2.      Officers' Entrance Near Mr. Harris's Home

"[T]he Fourth Amendment protects the curtilage of a house[.]" *United States v. Dunn*, 480 U.S. 294, 300 (1987). "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Brooks*, 645 F.3d 971, 975 (8th Cir. 2011). Four factors are relevant to whether a particular area should be considered within the curtilage:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id.*, 645 F.3d at 975.

The government admits that Office Moyster was around the back of the Mr. Harris's home, on the east side of the residence. Sergeant Bailey and Officers Miller and Steele stationed themselves on the west side of the building, around the front, where they were close enough to the windows to bang on them, rather than approaching the front door. Officer Lacy was positioned on

the northwest corner of the home, off to the side of the front entrance.  These facts tend to support

Mr. Harris's argument that the officers did encroach on the curtilage of Mr. Harris's home when

they went into his backyard and approached his front windows.  *See Fla. v. Jardines*, 569 U.S. at

6 ("This right would be of little practical value if the State's agents could stand in a home's porch

or side garden and trawl for evidence with impunity; the right to retreat would be significantly

diminished if the police could enter a man's property to observe his repose from just outside the

front window"); *Brooks*, 645 F.3d at 975 (holding that a shared backyard and stairwell to a

multiunit building were not curtilage as there was no "generalized expectation of privacy"); *United

States v. Gerard*, 362 F.3d 484, 487 (8th Cir. 2004) (holding that a freestanding garage was not

curtilage for Fourth Amendment purposes).

The Court notes that Mr. Harris's home is, in fact, a multiunit dwelling—either a duplex

or triplex.  However, the officers did not know this at the time.  "Objective data does not include

that found only *after* officers have invaded the area in question.  We believe that reasonable

officers would expect that the garage was likely to be used for private activities."  *Gerard*, 362

F.3d at 488 (8th Cir. 2004) (emphasis in original) (citing *United States v. Reilly*, 76 F.3d 1271,

1279 (2d Cir.), *on reh'g*, 91 F.3d 331 (2d Cir. 1996)).  While shared space may prevent a finding

that an area is curtilage for Fourth Amendment purposes, *see Brooks*, 645 F.3d at 975, in Mr.

Harris's case, it is admitted that the officers assumed that the area surrounding Mr. Harris's home

was part of his home.  The officers went so far as to knock wrongly on the neighboring unit's

window in order to get Mr. Harris's attention.  Ultimately, the Court concludes that whether the

officers did encroach on the curtilage of Mr. Harris's home when they went into his backyard and

approached his front windows is a finding the Court need not make to resolve Mr. Harris's motion

to suppress for reasons explained in this Order.

11

### 3.    Officers' Detention of Mr. Harris

"'[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Dortch*, 868 F.3d 674, 677 (8th Cir. 2017) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *see also United States v. McKines*, 933 F.2d 1412, 1415 (8th Cir. 1991) (en banc).  "Seizures fall into two categories:  investigative stops and arrests."  *Dixon*, 51 F.3d at 1380.  Here, Mr. Harris was clearly "seized" under the Fourth Amendment.  Officers had surrounded his home, with guns drawn, banged on his windows, and motioned for him to come outside at gunpoint when he eventually opened the door.  Though the government suggests that Mr. Harris could have "simply ignored the officers' requests," the Court is skeptical that reasonable people would believe that they could ignore six armed officers surrounding their home and calling for them to come speak to them, particularly when those officers continue knocking and waiting with guns drawn for several minutes (Dkt. No. 31).

The government, citing *Terry v. Ohio*, 392 U.S. 1 (1968), argues that the officers' seizure of Mr. Harris was not an arrest but an investigative stop.  In order to effect a temporary investigative detention, officers need only reasonable suspicion based on the totality of the circumstances.  *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *De La Rosa v. White*, 852 F.3d 740, 744 (8th Cir. 2017); *Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019).   While "[r]easonable suspicion is a lower threshold than probable cause," *United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006), it requires "at least some minimal level of objective justification." *De La Rosa*, 852 F.3d at 744 (internal quotation marks omitted); *see also Terry*, 392 U.S. at 27 (defining reasonable suspicion as something more than an "inchoate and unparticularized suspicion or 'hunch'").

12

"A *Terry* stop may become an arrest, requiring probable cause, if the stop lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010) (internal quotation marks omitted). While officers must use "the least intrusive means of detention and investigation . . . reasonably necessary" to conduct the stop, *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999), they are permitted to "take any measures that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *United States v. Sanford*, 813 F.3d 708, 713 (8th Cir. 2016) (per curiam) (quoting *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011)). "[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *United States v. Fisher,* 364 F.3d 970, 973 (8th Cir.2004); *see also Navarrete-Barron*, 192 F.3d at 791.

The government argues that Mr. Harris was detained outside of his home and that this detention was merely an investigative detention, pursuant to *Terry*, therefore avoiding any constitutional violations, while Mr. Harris argues that he was arrested for Fourth Amendment purposes inside of his home.

Even if, as the government argues, Mr. Harris was seized outside of his home, it is relevant to the Court's inquiry whether Mr. Harris's leaving his home was voluntary. If Mr. Harris came under the officers' control while still inside of his home, his seizure for Fourth Amendment purposes began there. The voluntariness of such actions has been acknowledged by the Eighth Circuit as an "important legal distinction." *United States v. Council*, 860 F.3d 604, 611 (8th Cir. 2017). "[A]n individual who is compelled to stand in a doorway cannot be lawfully arrested without the existence of probable cause and exigent circumstances." *Duncan v. Storie*, 869 F.2d

13

1100, 1102 (8th Cir. 1989).  Mr. Harris essentially argues that this logic should extend to those ordered out of their homes under color of law.  The Court observes that the right to privacy in your own home would mean very little if the police could, without a warrant and in pursuit of an unwitnessed misdemeanor,[1] order you out of your home, into a public place, and thereby open you up to detention or arrest.

"Whether an individual's consent is voluntary is a question of fact that must be determined from the totality of the circumstances."  *United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009).  "The 'ultimate question' is whether the individual's 'will ha[s] been overborne and his capacity for self-determination critically impaired,' such that his consent . . . must have been involuntary."  *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (quoting *United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006)).

When Mr. Harris came to his doorway, he did so "in response to a demand under color of authority."  *United States v. Conner*, 127 F.3d 663, 666 (8th Cir. 1997).  Here, six uniformed

---

[1] The Court observes that Arkansas law makes injuring an animal owned by another person without legal privilege or the owner's consent a misdemeanor, unless the accused individual has prior convictions within a certain number of years for certain types of offenses; if that is the case, the alleged conduct may warrant a felony charge.  ARK. CODE ANN. § 5-62-103 (2020).  As a result, it is not clear that the alleged conduct Ms. Fitzhugh attributed to Mr. Harris constitutes more than a misdemeanor offense under Arkansas law.

The Court acknowledges that allegations of felon in possession of a firearm or ammunition may result in federal felony charges.  *See generally* 18 U.S.C. § 922.  It is not clear on the record before the Court when Officer Harton learned of Mr. Harris's prior felony convictions in relation to when the NLRPD officers approached Mr. Harris's residence and when Officer Harton handcuffed Mr. Harris on December 14, 2019.  As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, *United States v. Phillips,* 540 F.2d 319 (8th Cir. 1976), *cert. denied,* 429 U.S. 1000 (1976), but on the government to justify a warrantless search, *United States v. Bruton,* 647 F.2d 818 (8th Cir. 1981), *cert. denied,* 454 U.S. 868 (1981).  The record establishes that, in the course of Officer Harton's interactions with Mr. Harris, he learned at some point that Mr. Harris had prior felony convictions.

The Court acknowledges these issues but determines it need not resolve them for purposes of ruling on Mr. Harris's motion to suppress.

14

officers surrounded the residence in an effort to make contact with Mr. Harris.  Officer Moyster was around back on the east side of the residence, and Sergeant Bailey was on the west side.  Officers Miller and Steele were on the west side closest to the door, and Officer Lacy was on the northwest corner.  Officer Steele had a patrol rifle, which was an AR-15.  Officer Steele with an open palm banged on a window announcing NLRPD.  Officer Steele did not approach the front door, as he was concerned about an active shooting event.  According to Officer Steele, Sergeant Bailey was on the west side because no one realized the house was a multiunit dwelling; Mr. Harris did not reside on that side.  According to Officer Steele, Sergeant Bailey may have said, "North Little Rock Police, we need to talk to you," while outside on the west side.  Sergeant Bailey had a pistol drawn, pointed it at Mr. Harris but dropped it at some point when Mr. Harris exited the residence.  According to Officer Steele, it took Mr. Harris approximately seven to ten minutes to open the door to the residence.  Mr. Harris disputes this timeline, claiming that he responded quickly.  Officer Steele testified that, when he exited, the officers directed Mr. Harris to put his hands up and to make a complete circle, which he did.  Mr. Harris was compliant.

"No doubt there is a line where officers' actions are coercive enough that compliance can no longer be deemed voluntary. . . ."  *Council*, 860 F.3d at 612.  Mr. Harris argues that he did not voluntarily leave his home.  Officers had surrounded his home, held him at gunpoint when he opened his door, and ordered him out of his home at gunpoint.  The video evidence shows Officer Steele, with gun drawn, motioning for Mr. Harris to come out of his doorway.  Given this, the Court concludes that the officers' "seizure" of Mr. Harris likely began while he was inside of his home.[2]

---

[2]  The witness's identification of Mr. Harris as the individual who shot the dog constitutes "reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed," and Mr. Harris's denials do not change the sufficiency

#### 4.   Exceptions To Fourth Amendment Requirements

The Court next considers whether the officers' conduct was permissible under a recognized exception to the Fourth Amendment.

#### a.   Limits Of The "Knock-And-Talk" Exception

The Eighth Circuit has acknowledged a "knock-and-talk" exception to the rule against warrantless entry into a home.  "No Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways."  *Wells*, 648 F.3d 671, 679 (8th Cir. 2011) (citing *United States v. Reed*, 733 F.2d 492, 501 (8th Cir.1984)).  "This principle permits police officers—consistent with the Fourth Amendment—to 'approach[ ] the front door to announce their presence,' make 'inquir[ies],' and 'request consent to search the remainder of the

---

of that information.  *United States v. Council*, 860 F.3d 604, 609 (8th Cir. 2017); *United States v. Hartje*, 251 F.3d 771, 775 (8th Cir. 2001).  In other words, these facts may establish probable cause to arrest Mr. Harris.  Probable cause alone may not be sufficient to resolve whether the officers' conduct was constitutional under the circumstances of this case, if the alleged conduct Ms. Fitzhugh attributed to Mr. Harris constitutes no more than a misdemeanor offense.  The Court acknowledges that allegations of felon in possession of a firearm or ammunition may result in federal felony charges.  *See generally* 18 U.S.C. § 922.  It is not clear on the record before the Court when Officer Harton learned of Mr. Harris's prior felony convictions in relation to when Officer Harton handcuffed Mr. Harris on December 14, 2019.

Neither Officer Harton nor Officer Steele witnessed the shooting of the dog, and the Supreme Court has not decided whether the Fourth Amendment permits a warrantless arrest for a misdemeanor when the alleged offense did not occur in the presence of the arresting officer. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 340 n.11 (2001).  Although the weight of authority holds that the Fourth Amendment does not impose an "in the presence" requirement of this type, *see Woods v. City of Chicago*, 234 F.3d 979, 995 (7th Cir.2000) (collecting cases); *see also Welsh v. Wisconsin*, 466 U.S. 740, 756 (1984) (White, J., dissenting), the Eighth Circuit has not decided the point, *cf. Garske v. United States*, 1 F.2d 620, 622-23 (8th Cir.1924).  *See Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1258 (8th Cir. 2010).

Here, the alleged offense did not take place in the presence of any of the officers.  As a result, Mr. Harris's case may raise additional questions under the Fourth Amendment.  The Court acknowledges these additional questions but determines it need not resolve them to resolve Mr. Harris's motion to suppress.

property,' 'commonly referred to as a 'knock and talk.'" *Id.* (quoting *United States v. Weston*, 443 F.3d 661, 667 (8th Cir.2006)).  The Eighth Circuit has "never found such consent where officers made no attempt to reach the homeowner at the front door."  *Id.*  "When officers objectively exceed the scope of this license, the knock-and-talk exception cannot justify their warrantless intrusion of the curtilage." *White*, 928 F.3d at 740 (8th Cir. 2019).

The police did not approach Mr. Harris's home in the manner that could be considered a "knock and talk."  At the time that the officers attempted to contact Mr. Harris inside his home, six uniformed NLRPD officers had surrounded his residence, including around the back.  Further, given valid concerns for officer safety and concerns that anyone inside the home may be armed, they did not simply knock on the front door but banged on the windows, announcing their presence and potentially requesting to speak to Mr. Harris.  Officer Steele was on the west side of the building, closest to the front door and was holding a semi-automatic AR-15.  Sergeant Bailey had a pistol drawn and pointed at Mr. Harris as he exited his home.  Mr. Harris was then handcuffed, after he exited the home.  "[T]heir behavior objectively reveal[ed] a purpose to conduct a search, which is not what anyone would think he had license to do."  *Jardines*, 569 U.S. at 10; *see also White*, 928 F.3d 734, 739-40 (8th Cir. 2019)

Given these facts, the NLRPD officers' interaction with Mr. Harris cannot be construed as a "knock-and-talk" under current Eighth Circuit law.  Therefore, the Court declines to find that the "knock-and-talk" exception justifies a warrantless intrusion of Mr. Harris's curtilage.

### b.    Exigent Circumstances

It is "well-established that the police may not invade a person's house without a warrant except under very limited circumstances, such as the presence of exigent circumstances or an

occupant's consent."[3]  *United States v. McMullin*, 576 F.3d 810, 814-15 (8th Cir. 2009).  Exigent circumstances permit warrantless entries when "lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed."  *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996).  Additionally, the consent of a house's occupant makes a warrantless entry into a house reasonable for the purposes of the Fourth Amendment.  *See United States v. Spotted Elk*, 548 F.3d 641, 652 (8th Cir. 2008).  Exigent circumstances may also justify a warrantless arrest of an individual in their home.  *See Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984) (a factor to consider "when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made")

"Exigent circumstances exist if an objectively reasonable officer on the scene would have sufficient grounds to believe an exigency existed."  *Poe*, 462 F.3d 997, 1000 (2006) (citing *United States v. Schmidt*, 403 F.3d 1009, 1013 (8th Cir.2005)).  When officers have a legitimate concern

---

[3]  The Court is aware of the line of cases calling into question whether a warrantless home arrest for a misdemeanor will ever be justified when officers claim exigent circumstances created by hot pursuit.  *See Stanton v. Sims*, 571 U.S. 3, 7 (2013); *Welsh v. Wisconsin,* 466 U.S. 740 (1984); *Greiner v. City of Champlin*, 27 F.3d 1346, 1353-54 (8th Cir. 1994); *see also Butler v. State,* 829 S.W.2d 412, 415 (Ark. 1992) ("[E]ven though Officer Sudduth might have been under the impression that he was in continuous pursuit of Butler for what he considered to be the crime of disorderly conduct . . . since the crime is a minor offense, under these circumstances there is no exigent circumstance that would allow Officer Sudduth's warrantless entry into Butler's home for what is concededly, at most, a petty disturbance").

The government does not claim exigent circumstances created by hot pursuit.  Instead, the government claims exigent circumstances due to legitimate concern for officer and community safety.  When considering such arguments, it is not clear that the Eighth Circuit Court of Appeals considers whether the underlying offense involved a misdemeanor or a felony.  *See, e.g., United States v. Quarterman*, 877 F.3d 794 (8th Cir. 2017); *United States v. Hill*, 430 F.3d 939 (8th Cir. 2005).

The Court ultimately need not decide what would be an appropriate exigency or whether circumstances created an appropriate exigency in this case because, as discussed elsewhere in this Order, the Court finds that Mr. Harris's consents and incriminating statements are sufficiently attenuated from any allegedly unconstitutional actions.

for their safety and the safety of the community, this may constitute an exigent circumstance justifying a warrantless entry into a residence or its curtilage. *Id.*; *United States v. Hill*, 430 F.3d 939, 941 (8th Cir. 2005); *Duncan v. Storie*, 869 F.2d at 1102 n.3 (listing factors for assessing exigent circumstances). "Legitimate concern for the safety of individuals may constitute 'exigent circumstances' justifying warrantless entries and searches." *United States v. Scott*, 876 F.3d 1140, 1143 (8th Cir. 2017) (quoting *United States v. Janis*, 387 F.3d 682, 687 (8th Cir. 2004) (holding exigent circumstances justified a warrantless entry where officers knew a gun had discharged and injured someone, were told the gun was in the house, and observed blood in the driveway)).

While "[t]he presence of a weapon in a home does not necessarily constitute exigent circumstances," "[the Eighth Circuit] has consistently found exigent circumstances where officers reasonably believed a gun or an armed individual presents a danger to themselves or others." *United States v. Quarterman*, 877 F.3d 794, 798 (8th Cir. 2017); *see United States v. Murphy*, 69 F.3d 237, 243 (8th Cir. 1995) ("[A] reasonable belief that firearms may have been within the residence, standing alone, is clearly insufficient to justify excusing the knock and announce requirement."). The Eighth Circuit has held that, in some circumstances, even when an individual "had not used or explicitly threatened to use" a gun, "[r]easonable, experienced officers would not ignore [the presence of] the gun." *Quarterman*, 877 F.3d at 798.

Here, the incident involved a firearm, and officers were responding to a report of a shot fired. The officers arrived on the scene to see a dog shot in the head in the middle of a residential street. The officers observed both the injured animal and the blood in the street. It was the middle of a Saturday, and a mother and her minor children witnessed the event and directed the officers to Mr. Harris's home. However, the alleged underlying crime appears to have been an unwitnessed misdemeanor. Mr. Harris had not used or threatened to use a firearm against any person, nor did

the officers know with certainty that Mr. Harris was the shooter or had possession of a gun.  He had retreated into his home.  *See Minnesota v. Olson*, 495 U.S. 91, 91-92 (1990) (upholding a state supreme court finding that exigent circumstances did not exist when the officers did not know that the defendant was guilty of the underlying crime and there was no immediate danger or urgency demanding the apprehension of the defendant).

"[T] burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness."  *Welsh*, 466 U.S. at 750.  Under these circumstances and existing case law, the Court does not need to decide whether these facts amount to sufficient exigent circumstances to resolve Mr. Harris's motion to suppress, given the Court's conclusion that Mr. Harris's consents and incriminating statements were sufficiently attenuated to purge any unconstitutional taint.

## 5.    The Attenuation Doctrine Makes The Application Of the Exclusionary Rule Inappropriate

Mr. Harris asserts that, because the constitutional violation occurred at the time he encountered officers while inside his home, purportedly in violation of *Payton*, both the evidence collected in the searches and his incriminating statements must be excluded as evidence.  The government argues that, even if NLRPD officers' conduct purportedly violated the Fourth Amendment, the attenuation doctrine applies and that, as a result, suppression is inappropriate in this case.  Without deciding whether the NLRPD officers' conduct comported with the requirements of, and recognized exceptions to the requirements of, the Fourth Amendment, the Court determines that the attenuation doctrine applies and that suppression is inappropriate.

The attenuation doctrine is an established exception to the exclusionary rule.  "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected

20

by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (citing *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)); *see also United States v. Dickinson*, 64 F.3d 409, 410 (8th Cir. 1995). The Eighth Circuit has held that some intervening voluntary acts on the part of a defendant, such as consenting to a search, may be sufficient to purge the taint of an illegality. *See Dickinson*, 64 F 3d at 410-11; *United States v. Ramos*, 42 F.3d 1160, 1163-64 (8th Cir. 1994) (overruled on other grounds). The Supreme Court has held that the doctrine is not limited only to "independent acts by the defendant." *Strieff*, 136 S. Ct. at 2061. The factors to be considered in determining whether the taint of illegality is purged are: "(1) the temporal proximity between the illegal search or seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *United States v. Becker*, 333 F.3d 858, 862 (8th Cir. 2003); *see also United States v. Yorgensen*, 845 F.3d 908, 914 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 89 (2017).

The Supreme Court has held that the temporal proximity requirement does not favor attenuation unless "substantial time elapses between an unlawful act and when the evidence is obtained." *Strieff*, 136 S. Ct. at 2062 (citing *Kaupp v. Texas*, 538 U.S. 626, 633 (2003)). The Eighth Circuit has found that 15 minutes was sufficient to demonstrate an attenuation of any illegality. *United States v. Whisenton,* 765 F.3d 938, 942 (8th Cir. 2014); *see also United States v. Herrera-Gonzalez,* 474 F.3d 1105, 1112 (8th Cir. 2007) (finding that while ten minutes does not in itself suggest sufficient attenuation to purge the taint of the stop, neither does it compel the conclusion that the attenuation was insufficient); *United States v. Palacios-Suarez,* 149 F.3d 770, 773 (8th Cir. 1998) (finding that a nine-minute period between the start of the violation and the consent suggested that the taint was purged); *United States v. Reisselman,* 646 F.3d 1072, 1081

(8th Cir. 2011) (upholding the district court's denial of a motion to suppress statements under the attenuation doctrine where defendant post-*Miranda* voluntarily provided incriminating statements fifteen to twenty minutes after an unlawful search of his person).  In the present case, Mr. Harris signed the consent form allowing the police to search his car at 1:19 p.m., approximately 15 minutes after he was first placed into handcuffs.  No evidence was retrieved from this search. Twenty minutes later, at 1:39 p.m., approximately 30 minutes after the officers first engaged Mr. Harris, Mr. Harris signed the consent form allowing the officers to search his home.  His incriminating statements were not made until after the search of his home was completed and the officers had found the ammunition in his home, roughly one hour after the encounter began. Therefore, the consideration of temporal proximity weighs in favor of attenuation and against suppression.

        There were also several intervening circumstances that took place between the time officers made contact with Mr. Harris and when Mr. Harris allegedly made the purportedly incriminating statements.  First, Mr. Harris received verbal *Miranda* warnings.  *See United States v. Yorgensen*, 845 F.3d 908, 914 (8th Cir. 2017) ("Providing *Miranda* warnings is an 'important, although not dispositive,' factor that weighs against suppression" (citations omitted)).  Second, Mr. Harris gave verbal and written consent to search his vehicle and watched while that search was completed. Third, he gave verbal and written consent to search his residence, asked whether officers would "turn his house upside down," witnessed the search, and conversed with officers during the search. *See Whisenton*, 765 F.3d at 942 (discussing "tear his house up" as evidencing defendant's deliberate consideration of the situation and providing consent in finding that any consent was attenuated from an illegal search).

In determining the presence of intervening factors, "[c]onsent can be an intervening circumstance if the government shows:  '(1) that the defendant's consent was voluntary and (2) that 'the consent was an independent act of [the defendant's] free will that purged the taint of the Fourth Amendment violation.'"  *United States v. LeBeau*, 867 F.3d 960, 972 (8th Cir. 2017) (alteration in original) (quoting *United States v. Whisenton*, 765 F.3d 938, 941 (8th Cir. 2014)).  The Court considers if a defendant had time to contemplate his situation.  *See United States v. LeBeau*, 867 F.3d 960, 973 (8th Cir. 2017) ("The presence of intervening circumstances that provide the defendant an opportunity 'to pause and reflect, to decline consent, or to revoke consent' help demonstrate that the illegality was attenuated.").  The Court examines the totality of the circumstances to determine whether consent is knowing and voluntary.  *United States v. Flores*, 474 F.3d 1100, 1104-05 (8th Cir. 2007) (citing *United States v. Gipp*, 147 F.3d 680, 685 (8th Cir. 1998)).  The government bears the burden and must prove by a preponderance of the evidence that the defendant behaved in such a manner that the officer reasonably believed that the search was consensual.  *Id.*  The following factors are relevant:  (1) the defendant's age, (2) his general intelligence and education, (3) whether he was intoxicated at the time, (4) whether he consented after being informed of his *Miranda* rights, and (5) whether he was aware of his rights and protections due to previous arrests.  *United States v. Comstock*, 531 F.3d 667, 676-77 (8th Cir. 2008).  Other relevant circumstances include:  (1) the length of time the subject was detained, (2) whether the officers acted in a threatening manner, (3) whether any promises or misrepresentations were made, (4) whether the subject was in custody or under arrest at the time, (5) whether the consent occurred in public, and (6) whether the subject was silent as the search was conducted.  *Id.*

Mr. Harris is 49 with a prior criminal history.  He displayed general intelligence.  He did not appear to be, and does not claim to have been, intoxicated at the time.  He consented after

being informed of his *Miranda* rights and signing a consent to search that informed him of his right to refuse consent and to revoke consent at any time.  Though he was in custody and handcuffed during the searches, Mr. Harris's detention was about one hour in total and took place at his home.  While the officers admittedly had weapons drawn earlier in their interactions with Mr. Harris, those weapons were put away and no longer displayed at the time Mr. Harris provided his consents to search.  Further, although the officers made alleged misrepresentations in their discussions with Mr. Harris, the officers did not act in a threatening manner during the course of obtaining Mr. Harris's consent, and Mr. Harris was present during the search and never revoked consent.  Mr. Harris and the officers engaged in conversation throughout the search of both his vehicle and home.  Given the totality of the circumstances, Mr. Harris's consent was voluntarily made and never revoked.  Therefore, his consent is a valid intervening circumstance weighing in favor of attenuation and against suppression.

"The third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Strieff*, 136 S. Ct. at 2063 (finding that an officer's "good-faith mistakes" did not rise to a purposeful or flagrant violation of Fourth Amendment rights).  There is no indication or allegation in the present case that the NLRPD officers were not acting in good faith.  The Court does not find that the officers acted purposefully or flagrantly in violation of Mr. Harris's Fourth Amendment rights.  "For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Strieff*, 136 S. Ct. at 2064; *see Kaupp*, 538 U.S. at 628, 633 (finding flagrant violation where a warrantless arrest was made in the arrestee's home after police were denied a warrant and at least some officers knew they lacked probable cause).

24

For all of these reasons, the Court concludes that the attenuation doctrine applies and that suppression is inappropriate under these circumstances.

### C.    Conclusion Regarding The Events of December 14, 2019

For the reasons described above, even if the Court were to assume for purposes of resolving the motion to suppress that the officers' initial engagement with Mr. Harris was unconstitutional, his consents to search his vehicle and his home were voluntary and sufficiently attenuated, along with his incriminating statements, to remain valid under the law.

### D.    Factual Background:  Events Of December 19, 2019

Mr. Harris alleges that, on December 19, 2019, police illegally arrested him on a public street, without a warrant or probable cause to believe that he committed a crime.  He moves to suppress statements he made to police after his allegedly illegal arrest on December 19, 2019.  He also moves to suppress the physical evidence seized from his home on December 19, 2019, because he maintains that the search and seizure warrant was invalid and the method of executing it was unreasonable.  Mr. Harris asserts that the probable cause affidavit failed to state sufficient facts that there was probable cause to believe that the government agents would find evidence of a crime inside his residence.  He also argues that the search of his residence was unreasonable because the police used a battering ram to bust down his door, even though they had possession of a key to the residence Mr. Harris gave them that, if used, would have avoided the damages to his residence that the battering ram caused.

Detective Michael Gibbons testified at the suppression hearing.  Detective Gibbons is a homicide detective with the NLRPD Department and assigned as the task force officer ("TFO") with the Bureau of Alcohol Tobacco and Firearms ("ATF") for Little Rock.  Detective Gibbons has been with the NLRPD Department for 26 years, a detective for 21 years, and an ATF TFO for

10 years.  Detective Gibbons received an email with a brief summary of the events that occurred during the shift, which is typically sent out by the Sergeant on the shift so that other officers coming on duty are aware.  Detective Gibbons pays close attention to offenses involving firearms and the discharging of firearms.  The events with Mr. Harris caught his attention, as Mr. Harris, who was a felon, is alleged to have discharged a firearm on a Saturday afternoon at close range with children present and shot a dog.

Detective Gibbons pulled from the computer system any and all reports associated with the call, reached out to the individual officers on the scene to clarify anything, where he spoke with Officers Harton and Steele, printed their reports, and obtained certified convictions of Mr. Harris to confirm Mr. Harris was a felon.  Detective Gibbons testified that, after looking at the totality of the circumstances, he contacted the U.S. Attorney's Office to determine whether to open a case and obtain a search warrant for Mr. Harris's residence.

In this case, Detective Gibbons wanted a search warrant for Mr. Harris's residence because the officers on the scene did not find a firearm, having done a quick on-scene search, but more officers trained to do a more thorough search and searching with a warrant may conduct a better search.  Further, Detective Gibbons testified that, given the various assortments of caliber ammunition Mr. Harris was found to possess based on the quick on-scene search, he found it hard to believe that Mr. Harris would have that many types of ammunition, utilize a firearm to shoot a dog, and not have a firearm in the house.  Based on his knowledge and experience, Detective Gibbons drafted an application for search warrant (Gov. Ex. 5).  The application included an affidavit containing information based on his knowledge and belief as he knew it at that time to be correct.  It was relevant to Detective Gibbons that Mr. Harris had two prior convictions for felon in possession of firearms by certain persons.  Detective Gibbons also believed that the application

and affidavit contained sufficient probable cause for the search warrant to be issued.  The application was submitted to United States Magistrate Judge Beth Deere, who signed it.  The search warrant permitted a search for evidence of ammunition, firearms, ownership manuals, and components thereof, as well as other matters specified in the warrant.

Detective Gibbons testified that Mr. Harris was arrested on December 19, 2019, at approximately 8:00 a.m. before the search warrant was executed.  He was arrested on probable cause of being a felon in possession of ammunition.  No formal charge had been filed at the time of his arrest.

Mr. Harris maintains that the method in which the search warrant was executed was unreasonable.  He contends that the officers had a key to his residence but used a battering ram to knock down his front door.  Detective Gibbons testified that he had a key, the key did not work to open the door, and he was given authority to use a battering ram to gain entrance.  He testified it was not an option to permit Mr. Harris to use the key to gain entry to the residence for purposes of the officers' executing the search warrant.

Detective Gibbons also testified that, when the search warrant was executed on December 19, 2019, additional ammunition was located in the nightstand beside the bed in the master bedroom.  Detective Gibbons testified that Officer Harton informed him before and after the search on December 19, 2019, that Officer Harton had searched that nightstand on December 14, 2019.  Further, Detective Gibbons observed that Mr. Harris's house was very clean and very organized.  Detective Gibbons testified that the ammunition located on December 19, 2019, was in plain view when the drawer to the nightstand was opened.

E.        **Legal Analysis:  Events Of December 19, 2019**

1.        **Detective Gibbons's Probable Cause Affidavit And The Warrant**

Mr. Harris challenges Detective Gibons's probable cause affidavit, underlying the December 19, 2019, warrant.  The Fourth Amendment to the United States Constitution says that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  As a result, the Fourth Amendment establishes two requirements:  (1) particularity and (2) probable cause.  *United States v. Swift*, 720 F. Supp. 2d 1048, 1055 (E.D. Ark. 2010) (internal quotations omitted).

Even if this Court were to assume for purposes of resolving the motion to suppress only that the warrant executed on December 19, 2019, lacked probable cause, that does not automatically result in the suppression of evidence obtained during the execution of the search warrant.  "Before 'reviewing the existence of probable cause,' this court 'may consider the applicability of the good-faith exception to the exclusionary rule,'" which permits evidence obtained in reliance on an "objectively reasonable" warrant.  *United States  v.  Addidas Williams*, No. 19-2877 (8th. Cir., filed September 30, 2020)  (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)).  In other words, the "exclusionary rule is not applied in cases 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'"  *United States v. Fiorito*, 640 F.3d 338. 345 (8th Cir. 2011) (quoting *United States v. Leon*, 468 U.S. 897 920 (1984)).  "In cases of good faith, the evidence, although seized pursuant to a warrant that lacked probable cause, nonetheless is admissible at trial."  *Id.*  The good-faith exception applies unless, as applicable here, the affidavit in support of the warrant is "so

28

lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. 897, 923 (1984).

"*Leon* identified four circumstances in which an officer's reliance on a warrant is not in objective good faith:  (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned her judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid."  *Id.*  "Entirely unreasonable is not a phrase often used by the Supreme Court, and we find nothing in *Leon* or in the Court's subsequent opinions that would justify our dilution of the Court's particularly strong choice of words."  *United States v. Ross*, 487 F. 3d 1120, 1122-23 (8th Cir. 2007).

Mr. Harris has not alleged that Detective Gibbons knowingly and intentionally included a false statement or made one in reckless disregard of the truth.  There is no allegation that the warrant itself was facially deficient nor any allegation that the issuing judge wholly abandoned her role.  If Mr. Harris intends to argue that that the affidavit so lacks indicia of probable cause as to render official belief in its existence unreasonable, he has failed to show sufficient evidence suggesting that the facts contained in the affidavit were disconnected from the crimes alleged, the place to be searched, or the evidence sought, such that belief in those facts was "entirely unreasonable."  In his affidavit, Detective Gibbons explains why, based on his training and experience and the facts known from NLRPD officers' encounter with Mr. Harris on December 14, 2019, he believed that officers would find evidence relating to violations of 18 U.S.C. §

922(g)(1).  Detective Gibbons explained that, when officers did the consent search on December 14, 2019, they did not locate the firearm used to the shoot the dog, nor did they seize the other evidence described by Detective Gibbons in his affidavit such as:  gun cases, owner's manuals, and other indicia of ownership of firearms.  Because only five days lapsed between the December 14, 2019, consent search and the December 19, 2019, search warrant, Detective Gibbons had a good-faith belief that these items would still be located in the residence.  Therefore, the *Leon* exception applies, and exclusion of evidence seized pursuant to the December 19, 2019, search warrant is not appropriate.

> **2.    The Reasonableness of Officers' Execution Of The Warrant On December 19, 2019**

Mr. Harris also argues that the NLRPD officers' method of entry into his residence on December 19, 2019, was unreasonable because the officers used a battering ram to open his front door, when he had given them a key and was seated in a police vehicle at the scene.

In this case, officers waited over 35 seconds between knocking and announcing their presence and using a battering ram to knock down the door.  "The determination of whether an officer was justified in forcing entry after announcing his presence and purpose does not turn on any hard and fast time limit, but depends upon the circumstances confronting the officer serving the warrant."  *United States v. Stropes*, 387 F.3d 766, 772 (8th Cir. 2004) (citing *United States v. Lucht,* 18 F.3d 541, 549 (8th Cir. 1994); *see also United States v. Vesey*, 338 F.3d 913, 916 (8th Cir. 2003) (approving a ten second delay where the residence was small and officers suspected the presence of drugs); *United States v. Goodson,* 165 F.3d 610, 614 (8th Cir. 1999) (approving a 20 second delay where officers suspected the presence of drugs and expressed a legitimate concern for officer safety).

In this case, prior to executing the search warrant, Detective Gibbons obtained the key to Mr. Harris's residence. Detective Gibbons, along with six other officers, knocked and announced their presence for over 35 seconds. During that time, Detective Gibbons attempted to use the key to open the door, but the key would not work. According to Detective Gibbons, it was "not an option" to allow Mr. Harris to assist with opening the front door, as officers had no knowledge of what lay just on the other side. Not knowing if there were other occupants in the residence, or who was watching the attempt to make entry into the residence, Detective Gibbons, for officer safety, used a battering ram to open the door. The Court concludes that, in these circumstances, the officers' actions were reasonable.

### F.     Conclusion Regarding The Events of December 19, 2019

For the foregoing reasons, the Court finds that suppression of evidence seized pursuant to the warrant executed on December 19, 2019, is not appropriate under the *Leon* good faith exception. Further, considering the facts and circumstances, the Court determines that the officers' method of entry into the residence was not unreasonable.

### II.     Motion To Amend Order Setting Conditions Of Release

Mr. Harris also moves for the Court to amend the December 23, 2019, Order setting conditions of release, which ordered Mr. Harris's detention pending trial due to danger to the community. Mr. Harris argues that this determination was based on the evidence he alleges was unlawfully discovered in violation of the Fourth Amendment.

Because the Court denies Mr. Harris's motion to suppress the evidence at issue, the Court also denies Mr. Harris's motion to modify his detention order.

31

Dated this 2nd day of October, 2020.

_____
Kristine G. Baker
United States District Judge